**Travis Mayor**, OSB #053210
Email: travis@mayorlaw.com
**Lance Brooks**, OSB #051079
Email: lance@mayorlaw.com
Mayor Law LLC
7157 SW Beveland St., Suite 100
Tigard, OR 97223
Telephone: 503.444.2825

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| PHILLIP THORN, Personal Representative of the ESTATE OF NICHOLAS G. THORN,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF PORTLAND, a municipal corporation; and ANDREW YOUNG,<br><br>Defendants. | Case No. **3:26-cv-02049**<br><br>**COMPLAINT**<br><br>Civil Rights Violations: 42 USC §1983, Fourth Amendment Excessive Deadly Force; and Wrongful Death (Battery and Negligence)<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff alleges as follows:

## CORE FACTS COMMON TO ALL CLAIMS

1. On October 4, 2024, at approximately 1:22 a.m., City of Portland Police Officer Andrew Young, a member of the Portland Police Bureau, shot Nicholas G. Thorn (hereinafter "Thorn") with an assault rifle from a position of cover despite being informed that Thorn had a pellet gun.

2. Prior to shooting Thorn, Officer Andrew Young was called to 5235 SE Lambert, Portland, Oregon to respond to a call by a neighbor regarding hearing yelling between residents of

an upstairs apartment. No report of weapons, physical altercation, or firearms were reported to Officer Young prior to his arrival on scene.

3. At approximately 12:46 a.m., Officer Young arrived on scene with another Portland Police officer, Officer Andrew Pearce. Neither officer witnessed any argument or disturbance upon arrival at the location.

4. Shortly thereafter, Officer Young and Officer Pearce moved up the stairs to the second-floor balcony and located unit B4. After knocking on the door, Officer Young shined his flashlight through a window and observed Thorn, who was naked and sleeping.

5. Officer Pearce looked through the living room window of apartment B4 and did not see or hear anyone in the apartment.

6. At approximately 12:47 a.m., after knocking again on the front door with a flashlight, Officer Young reported that the male was now up, pulled on some pants, and appeared to Officer Young to be drunk. Officer Young knocked a third time on an apartment window and shortly thereafter reported that Thorn had a gun inside the apartment.

7. Upon retreating down the stairs and into the parking lot, Officer Young informed Officer Pearce that the male may have a rifle, and he did not know if it was a real gun or not.

8. At approximately 12:48 a.m., Officer Young requested backup on scene.

9. Officer Young retrieved his rifle from his police car at 12:49 a.m. and requested that Officer Pearce shine a spotlight on Thorn who was standing outside his apartment on the balcony.

10. At approximately 12:50 a.m., in response to Officer Young stating “we believe you’re armed”, Thorn responded and informed them that he was not armed and that it was only a pellet gun.

11. During his initial communication with Portland Police, Thorn informed them that no one else was in the apartment and that his wife was in a vehicle within police view.

12. At approximately 12:52 a.m., Portland Police told Thorn that they did not want him to go inside and come out with a gun or he would be shot.

13. Several Portland Police Officers observed Thorn exit the apartment and fire the pellet gun into the air and believed that it was consistent with a pellet gun.

14. Portland Police spoke with Thorn's spouse, Katlyn Thorn, who was present on scene and told Police that he was drunk, and that she had picked him up from a bar and drove him home. Katlyn confirmed that they had argued but that it was not physical in any way and that she and her kids decided to leave the apartment. She informed Portland Police officers on scene that Thorn only had a pellet gun and had been with him when he purchased it. She further provided that Thorn did not own a real rifle.

15. Thorn voiced his concern to Police that he didn't do anything wrong and was just in his room.

16. At 12:55 a.m., Officer Young indicated that there were "no charges" against Thorn but he and other officers had assault rifles trained on Thorn at all times. Thorn was outside of his apartment.

17. At no time did Thorn flee the scene or evade police prior to being shot.

18. At least 12 Portland Police officers were on scene at the time that Officer Young shot Thorn.

19. Portland Police were aware that Thorn's father was enroute to the scene to speak with Thorn and help him through the situation.

20. Portland police did not call for Special Emergency Reaction Team (SERT) despite officers being on scene for over 35 minutes prior to Officer Young shooting Thorn.

21. At the time defendant Young killed Thorn, other officers had Thorn in their sights but did not fire.

**JURISDICTION AND VENUE**

22. This court has jurisdiction over plaintiff's claim of violation of federal constitutional rights under 28 U.S.C. §§1331 and 1343.

23. Venue is proper under 28 U.S.C. §1391(b) in that one or more of the defendants reside in the District of Oregon and plaintiff's claims for relief arise in this district.

24. The court has jurisdiction over plaintiff's supplemental state law claims under 28 U.S.C. §1367.

**PARTIES**

25. Phillip Thorn is a citizen and resident of the State of Oregon and the United States, is the father of Thorn, and is the duly appointed Personal Representative of the Estate of Nicholas G. Thorn (the "Estate"), Multnomah County Circuit Court Probate Case No. 25PB07710.

26. Defendant Andrew Young is an individual and employee of defendant City of Portland as an officer in the Portland Police Bureau. At all times material, Andrew Young was acting under color of law and within the course and scope of his employment as a police officer. Defendant Young is sued in his individual capacity.

27. Defendant City of Portland is a political subdivision of the State of Oregon. The Portland Police Bureau is a department or division of the City of Portland. Defendant City of

Portland is responsible under state law, ORS 30.265(1), for the acts and omissions of its employees, inclusive of defendant Young.

## ADDITIONAL FACTS COMMON TO ALL CLAIMS

28. In the early morning hours of October 4, 2024, Thorn was asleep inside his apartment alone and had consumed alcohol to the point where his wife picked him up from a bar and drove him home. Upon arriving back at their apartment, Thorn was yelling to the point that a neighbor called the police, and Thorn's wife left the apartment with their minor children.

29. At approximately 12:33 am on October 4, 2024, defendant City's Bureau of Emergency Communications ("BOEC") received a call from a neighbor of Thorn reporting that there was yelling coming from an upstairs apartment.

30. At no time on October 4, 2024, prior to Officers Young and Pearce knocking on Thorn's window and door, did any Portland police officer observe or receive communication from any source that Thorn had a firearm or had pointed a firearm at anyone.

31. One or more Portland Police officers, including Officer Young, observed Thorn to be "drunk" or intoxicated, and communicated that observation via radio to all responding officers.

32. On September 9, 2025, Plaintiff timely served written tort claim notice as required by ORS 30.275 on defendants by first class mail addressed to Robert L. Taylor, Portland Office of City Attorney and City of Portland Risk Management.

33. In 2012, the United States Department of Justice ("DOJ") commenced a lawsuit against the City of Portland "to remedy a pattern or practice of unconstitutional uses of force by

officers of the Portland Police Bureau." [1] The Settlement Agreement negotiated, pre-filing, by the City and the DOJ included terms related to the City's use of force policies, practices, and training, enhancement of its data collection and accountability practices.

34. In order to address the allegations of the pattern or practice of excessive use of force articulated in the DOJ lawsuit, the Portland Police Bureau had revised its use of force policies and training to emphasize de-escalation and accountability when policies and training intended to mitigate use of force are violated. In practice, however, the Portland Police Bureau does not effectively discipline officers who fail to de-escalate confrontations, does not effectively discipline officers who use excessive force, inclusive of excessive deadly force and does not effectively discipline supervisors who fail to follow the use of force review and reporting procedures essential to the accountability (disciplinary) process. The most recent Periodic Compliance Assessment Report filed by the DOJ concerning the City's compliance with the Settlement Agreement confirmed that, ten years post-settlement, "accountability remains a primary source of compliance concerns …"[2]

35. With specific reference to deadly force, since 2003, Portland Police Bureau members have been involved in not less than 60 officer-involved shootings. [3] The Bureau has determined that the actions of the involved officers have been "out of policy" and disciplined the involved officer on only three occasions. [4] In two of those, the discipline was subsequently invalidated in union grievance arbitration. Between 2008 and 2018, 33

---

1 United States of America v. City of Portland, 3:12-cv-02265-SI, Complaint, ECF 1, page 2, filed 12/17/12.

2 Seventh Periodic Compliance Assessment Report, page 3. ECF 369, filed 8/8/23. Indeed, the Bureau has a achieved a rating of "substantial compliance" with Section VIII ["Officer Accountability"] in only one of the seven periodic reporting periods. Id., pages 56 and 60.

3 City of Portland, Portland Police Bureau Officer-Involved Shootings and Critical Incidents, Eighth Report/January 2023, OIR Group, Table of Critical Incidents Reviewed by OIR Group 2004-2019, pp. 95-100.

4 *Id*.

of 57 (58%) of Portland Police Bureau officer involved shootings and in-custody deaths involved persons in mental health crises.

a) In 2003, Officer Scott McCollister shot and killed Kendra James during a traffic stop. James was unarmed and attempting to drive away from the officers. McCollister was never disciplined. He has now been promoted to detective.

b) In 2004, Officer Jason Sery shot and killed James Perez during a traffic stop. Perez was unarmed. Sery was never disciplined. He later resigned from the Portland Police Bureau. He was hired to work as a police officer by the City of Beaverton in 2008.

c) In 2005, Officer Leo Besner shot Raymond Gwerder in the back while he was on the phone with a police hostage negotiator, killing him. Besner was not disciplined. Instead, he was promoted to Sergeant.

d) In 2006, Officer Christopher Humphreys, Multnomah Sherriff Deputy Bret Burton, and Portland Police Sergeant Kyle Nice tackled and beat to death James Chasse, an unarmed man with mental illness who was trying to run away from the officers on foot. He died from blunt force chest injuries, sustaining twenty-seven fractures of fourteen ribs and a punctured lung. The officers did not tell paramedics what happened and instead of having Mr. Chasse transported to the emergency room, the officers tried to have him booked into jail. City Commissioner Dan Saltzman ordered two-week suspensions for Nice and Humphreys. But in July 2012, after the PPA challenged the disciplinary action, the suspensions were dismissed and the

City awarded Nice and Humphreys back pay. In 2009, while the Chasse-related discipline still pending, the police patrol office union, the Portland Police Association ("PPA") held a rally in downtown Portland after Chief Sizer and Saltzman placed Humphreys on paid administrative leave for shooting a 12-year-old Black girl with a bean-bag shotgun on a TriMet platform. The PPA held a rally in downtown Portland, bussing in its members and their families, distributing "I am Chris Humphreys" tee-shirts, and calling for a no-confidence vote in Sizer and Saltzman. An hour before the PPS planned to release the results of this vote, Saltzman reinstated Humphreys. Nevertheless, Saltzman was removed as police commissioner by Mayor Adams who also fired Chief Sizer in May 2010. Burton, the sheriff's deputy, was hired by the Portland Police in 2013 and was assigned to the unit dealing with mental illness. Sergeant Kyle Nice continued to have a successful career with Portland Police, awarded and honored in 2017 for his work on the Rapid Response Team with Fire. Christopher Humphreys continued his career at PPB until he was elected Sheriff of Wheeler County.

e) In 2006, Lieutenant Jeff Kaer shot and killed unarmed Dennis Young. Mayor Tom Potter, a former PPB police chief, terminated Lt. Kaer, finding that Lt. Kaer displayed poor judgment and decision-making leading up to the use of deadly force. The PPA appealed the termination to an arbiter, arguing, among other things, that the training principles and techniques were never intended to be rules of conduct and that no PPB officer had ever been disciplined for tactics leading up to a critical incident. The termination was reduced to a

thirty-day suspension and the City was required to pay Lt. Kaer almost a whole year of back pay.

f) In 2010, Officer Ronald Frashour shot Aaron Campbell, a twenty-five-year-old African-American man, with his AR-15 rifle. The killing happened after Mr. Campbell communicated with Officer James Quackenbush by text and call, agreeing to come outside, came out walking backward with his hands locked behind his head. But the text communication with Campbell was not relayed to the five officers standing outside, so they were surprised to see Campbell come out. A grand jury opined that Campbell's death was caused by critical police errors, including no central command, a lack of communication between officers and poor training. Officer Frashour was terminated by Mayor Sam Adams after Police Chief Mike Reese argued that it was unreasonable for Frashour to believe that Campbell posed an immediate threat to the officers. However, after the PPA appealed the termination decision, Officer Frashour was reinstated by Mayor Adams and awarded two years of back pay.

g) On May 12, 2010, members of PPB's Hotspot Enforcement Action Team ("HEAT") pulled over 25-year-old African-American Keaton Otis for a minor traffic violation. Otis was experiencing a mental health crisis. One officer reached in the car window and grabbed and tased Otis, and ultimately, officers fired 23 shots into Otis' car when they claim he reached for a gun, killing him. Every aspect of this shooting was found in policy. No officer was disciplined as a result of this shooting.

h) In 2011, Officer Dane Reister mistakenly fired lethal rounds from his beanbag shotgun at William Monroe, a man diagnosed with bipolar disorder, who was permanently disabled as a result. Monroe was running away from the officers when Reister shot him in the back five times. Mayor Charlie Hales terminated Reister and the District Attorney's office filed third and fourth-degree assault charges against him. This was the only effective termination of an officer for using deadly force. Officer Reister committed suicide in 2015 while criminal charges were still pending against him.

i) In 2012, Officer Justin Clary shot his AR-15 six times and killed Billy Simms who was driving away from the officer. The supervising sergeant failed to formulate a plan for the high-risk arrest. None of the involved officers were disciplined for this shooting.

j) In 2013, Officer Andrew Hearst shot his AR-15 at Merle Hatch. Hatch was experiencing a mental health crisis and was unarmed at the time. Hatch died from gunshot wounds inflicted by other officers at the scene. The City did not discipline Hearst for this shooting. The City rewarded him by allowing a waiver to apply for membership on the Bureau's SERT team as a direct result of his choice to use deadly force against an unarmed mentally ill man.

k) In 2015, Portland Police decided to perform a box-in maneuver of Ryan Sudlow's car in a busy gas station. Sergeant Gonzalez viewed the gas station as a "perfect" location for the box-in, despite the risk of death to several civilians. Officer Charles Asheim fired at Sudlow's car, the bullets ricocheting off the windshield. When Asheim fired, he was at an angle to Sudlow's

windshield and there was an occupied car on the other side of the gas pumps, a passenger in Sudlow's car, and a gas station attendant nearby. Although the initial training division analysis\ found Asheim's backdrop to be "almost a worst-case scenario" in addition to discussing the danger in choosing to make a high-risk arrest in a public place, the Commander's review found Asheim's use of deadly force to be within policy and Officer Asheim was never disciplined.

l) On February 9, 2017, Officer Andrew Hearst fired three rounds from his AR-15 rifle, killing Quanice Hayes, a 17-year-old Black teenager, within one minute of encountering him. At the time of the shooting, Quanice was unarmed, on his knees and not a threat to any officer or other person. At the time of the shooting, police officers were seeking a suspect in a reported armed robbery. This led them to a residence off NE 82nd Ave in Portland. Officers tracked the suspect to this residence and proceeded to station themselves outside trying to determine whether the person they were looking for was inside the residence. As they walked around the residence, an officer spotted Quanice hiding in an alcove between the house and the garage. When the officers came upon Quanice, they were surprised to see him. Despite there being two sergeants on scene, neither took command of the arrest team. Each of the officers involved remained out in the open, leaving themselves exposed to the potential threat posed by Quanice. There was no clear plan for how they would take Quanice into custody. Instead, different police officers shouted contradictory commands at him. He obeyed the commands of Officer Robert

Wullbrandt, and crawled on his hands and knees as ordered, coming to a stop when ordered to do so. He was then ordered to "get down on his face." When he started to comply with that order, Hearst shot him. An internal affairs investigation concluded that every aspect of the shooting was "in policy." The training division review of the shooting found almost every aspect of it demonstrated "sound and effective tactics." No officer was disciplined.

m) On July 30, 2019, Porland Police Officer Gary Doran fired eleven rounds at Lane Christopher Martin, striking him nine times and killing him. At the time he was shot, Mr. Martin was in the midst of a mental health crisis, was surrounded by police, had previously responded to use of less lethal force by dropping a camping hatchet that he was holding and by running away and was in possession of a small pocketknife with keys attached. Officer Doran was the only officer to use lethal force, although at least two other officers had their weapons aimed at Martin and did not fire. PPB trains its officers to fire their weapons in short bursts, stop and assess for effect. Officer Doran did not follow that training. Internal Affairs and Training Division reviews nevertheless concluded that Officer Doran's actions were within policy. Officer Doran was not disciplined.

n) On April 16, 2021, Officer Zachary DeLong fired two shots from his AR-15, one of which struck and killed Robert Delgado. At the time of the shooting, Mr. Delgado was houseless, camped in= Lents Park, was not suspected of committing a crime, but was displaying erratic and irrational behavior consistent with an emotional or mental health crisis that included picking up

and scattering his personal property and telling DeLong to "just fucking shoot me." When Delgado was non-compliant with Officer Delong's verbal commands to "get his ass on the ground", Officer DeLong took cover behind a tree, and pointed his AR-15 in Mr. Delgado's direction. Mr. Delgado was shot the next time he reached for something near his tent. Officer DeLong was not disciplined and was later promoted to Detective.

36. Upon information and belief, common threads define the City's on-going pattern or practice of tolerating and ratifying unconstitutional use of deadly force and include, but are not limited to: a) repeated failures by reviewing supervisory Bureau members and command staff to conduct investigations into matters which call the honesty or integrity of involved and witness officers into question, inclusive of contradictory physical, audio or video evidence; b) failure to effectively discipline officers when their statements of "justification" for their actions lack credibility, c) failure to effectively discipline officers for disregarding signs and symptoms suggesting a subject is mentally ill and/or experiencing a mental health crisis; d) failure to effectively discipline officers who fail to recognize opportunities to de-escalate confrontations and employ de-escalation techniques before resort to tactics likely increase the risk that force will be used.

37. With regard to the factual "justification" for defendant Young's use of deadly force against Thorn, the City was at all times material in possession of and/or had access to evidence which contradicted the narrative provided by officers on scene regarding the shooting of Thorn. With regard to the pre-shooting tactics employed during defendant's officers contact with Thorn, the City was at all times material in possession of and/or had access to evidence that there were opportunities for deescalation which its officers

recognized but failed to take and, in their place, employed tactics likely to increase the risk of use of deadly force against Thorn. Upon information and belief, despite the City's possession of and/or access to such evidence, neither defendant Young nor any other officer was effectively disciplined for their conduct in connection with the death of Thorn.

## CLAIMS FOR RELIEF

### FIRST CLAIM, DEFENDANTS CITY OF PORTLAND AND ANDREW YOUNG
### Violation of 4th Amendment; 42 U.S.C. §1983; Excessive Deadly Force

38. Plaintiff realleges paragraphs 1 through 37 above, and incorporates same by reference as though fully set forth.

39. At all times material, Thorn had a right under the Fourth Amendment to the United States Constitution to be free from unreasonable seizure through the use of excessive deadly force.

40. Defendant Young violated Thorn's Fourth Amendment rights by intentionally shooting Thorn without an objectively reasonable belief that Thorn presented an immediate threat of serious bodily harm to defendant Young or any other person.

41. Defendant City of Portland maintained a policy, custom or practice of deliberate indifference to Portland police officers' violations of the Fourth Amendment by use of excessive deadly force which policy was the moving force in defendant Young's deprivation of Thorn's Fourth Amendment rights described above and, following an internal investigation of defendant Young's shooting of Thorn and with full knowledge of the circumstances of Young's conduct, ratified, condoned and approved said defendant's conduct.

42. As a direct and proximate result of defendants' violations of Thorn's rights under the Fourth Amendment, Thorn died. Plaintiff, as Personal Representative of the Estate of Nicholas G. Thorn, is entitled to recover all compensatory damages available under 42 U.S.C. § 1983, including damages for Thorn's loss of life, in an amount to be determined by the jury at trial.

43. Defendant Young's conduct was undertaken with reckless or callous indifference to Thorn's federally protected constitutional rights. Plaintiff is therefore entitled to recover punitive damages against defendant Andrew Young under 42 U.S.C. § 1983 in an amount to be determined by the jury at trial.

44. Plaintiff should be awarded its attorney fees and costs against defendants pursuant to 42 U.S.C. § 1988.

**SECOND CLAIM, DEFENDANT CITY OF PORTLAND, ONLY**
**State Law Claim for Wrongful Death/Battery**

45. Plaintiff realleges paragraphs 1 through 44, above, and incorporates same by reference as though fully set forth.

46. Defendant Andrew Young, while acting within the course and scope of his employment for defendant City of Portland, intentionally engaged in harmful or offensive contact with Thorn, by shooting him.

47. As a result of this battery, Thorn died, and his surviving spouse, children, and parents, as statutory beneficiaries under ORS 30.020 are entitled to recover compensatory noneconomic and economic damages in such amount as, upon proof at trial, the jury may determine reasonable and just.

**THIRD CLAIM, DEFENDANT CITY OF PORTLAND, ONLY**
**State Law Claim for Wrongful Death/Negligence**

48. Plaintiff realleges paragraphs 1 through 47 above, and incorporates same by reference as though fully set forth.

49. Each of the following acts of one or more of defendant City of Portland's police officers responding to and participating in the seizure of Thorn were taken within the course and scope of their employment for defendant City of Portland, created an unreasonable and foreseeable risk of injury to Thorn, and were substantial factors in causing Thorn's death:

a) Failure to timely summon and await the arrival of Portland's Behavioral Health Unit, Tactical Negotiations Team and/or other officers with greater knowledge, skill, education, training and experience in behavioral health, crisis intervention and de-escalation.

b) Failure to place present and available officers with Enhanced Crisis Intervention Skills in charge of the plan and tactics for initiating and conducting communications with Thorn.

c) Failure to de-escalate and withdraw from the encounter once officers knew or reasonably believed that no criminal activity had occurred and no lawful basis existed for detention.

d) Failure to employ crisis intervention and de-escalation communication tactics and training to attempt to calm, de-escalate and reason with Thorn including, but not limited to attempting contact with Thorn by telephone, or by providing Thorn with a telephone to communicate, and attempting use of verbal deescalation techniques before verbally escalating the conflict by issuing verbal "challenges".

WHEREFORE, Plaintiff prays for a judgment against defendants as follows:

1. Compensatory damages available under 42 U.S.C. §§ 1983, including damages for Nicholas G. Thorn's loss of life, in an amount to be determined by the jury at trial;
2. Economic damages for Thorn's burial/memorial, the pecuniary loss to Thorn's estate, the pecuniary loss to Thorn's spouse, children, and parents; and non-economic damages for Thorn's spouse, children, and parents for their loss of society, companionship and services of Thorn in amount to be proven at trial.
3. Punitive damages against defendant Andrew Young under 42 U.S.C. § 1983 in an amount to be determined by the jury at trial.
4. Plaintiff's attorney fees and costs pursuant to 42 U.S.C. § 1988.
5. Pre-judgment interest.
6. Such other and further relief as the court may deem equitable and just.

**PLAINTIFF DEMANDS A JURY TRIAL.**

DATED: October 2, 2026.

MAYOR LAW, LLC

*/s/ Lance Brooks*

Lance Brooks, OSB No. 051079
lance@mayorlaw.com
Travis Mayor, OSB No. 053210
travis@mayorlaw.com

Attorneys for Plaintiff